UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY

FISHER,                             .
                                    .
        Plaintiff,                  .
                                    . Case No. 13-cv-05549
vs.                                 .
                                    . Newark, New Jersey
SCHOTT, et al.,                     . July 28, 2014
                                    .
        Defendants.                 .
                                    .


            TRANSCRIPT OF HEARING: ORAL ARGUMENT - EXCERPT
               BEFORE THE HONORABLE MICHAEL A. HAMMER
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

 For the Plaintiff:        ANDREW W. DWYER, ESQ.
                           The Dwyer Law Firm, L.L.C.
                           17 Academy Street
                           Suite 1201
                           Newark, NJ 07102
                           (973) 242-3636
                           Email: Andy@thedwyerlawfirm.com


 For the Defendant         MARC ZANE EDELL, ESQ.
 Hon. Francine A.          Genova Burns Giantomasi Webster LLC
 Schott:                   494 Broad Street
                           Newark, NJ 07102
                           (973) 533-0777
                           Email: Medell@genovaburns.com

                           ANGELO JOSEPH GENOVA, ESQ.
                           Genova Burns Giantomasi Webster LLC
                           494 Broad Street
                           Newark, NJ 07102
                           (973) 533-0777
                           Email: Agenova@genovaburns.com

                           WILLIAM G. NESTOR, III, ESQ.
                           Genova Burns Giantomasi Webster LLC
                           494 Broad Street
                           Newark, NJ 07102
                           (973) 230-2083
                           Email: Wnestor@genovaburns.com

```
 1  (APPEARANCES continued)

 2  For the Defendants      SUSAN MARIE SCOTT, ESQ.
    Elizabeth Ann           Office of The NJ Attorney General
 3  Strom, State of New     RJ Hughes Justice Complex
    Jersey:                 PO Box 112
 4                          Trenton, NJ 08625
                            (609) 777-3410
 5                          Email:
                            Susan.scott@dol.lps.state.nj.us
 6

 7

 8  Audio Operator:

 9  Transcription Service:      KING TRANSCRIPTION SERVICES
                                901 Route 23 South, Center Ste. 3
10                              Pompton Plains, NJ 07444
                                (973) 237-6080
11
    Proceedings recorded by electronic sound recording; transcript
12  produced by transcription service.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Commencement of excerpted proceedings at 3:31 P.M.)

 2

 3          THE COURT:  All right.  This is the matter of Lisa

 4  Fisher versus Schott, et al., Civil No. 13-5549.  Can I have

 5  appearances, please, starting with plaintiff.

 6          MR. DWYER:  Good afternoon, Your Honor, Andrew

 7  Dwyer from the Dwyer law firm for the plaintiff Lisa Fisher.

 8          MR. EDELL:  Good afternoon, Your Honor, Marc Edell

 9  for Judge Schott from the law firm of Genova Burns --

10          THE COURT:  Genova Burns?

11          MR. EDELL:  -- Giantomasi & Webster.

12          THE COURT:  All right.

13          MR. EDELL:  Sorry.

14          MR. GENOVA:  Good afternoon, Your Honor, Angelo

15  Genova from the law firm of Genova Burns Giantomasi &

16  Webster.

17          MS. SCOTT:  Good afternoon, Your Honor, deputy

18  attorney Susan Scott for the State defendants.

19          THE COURT:  I figured yours would be easier, okay.

20          MR. NESTOR:  Good afternoon, Judge, Bill Nestor on

21  behalf of Judge Schott also from Genova --

22          THE COURT:  The Genova firm?

23          MR. NESTOR:  Giantomasi & Webster --

24          MR. EDELL:  He's licensed at Genova Burns, but I

25  didn't know whether I should -- try to do it all.
```

 1                    MR. GENOVA:  It's okay.

 2                    THE COURT:  All right.  Have a seat.

 3                    All right.  So we have a number of issues in front

 4     of us, all rather interrelated concerning discovery.  I have

 5     carefully reviewed the parties' submissions.  I've read the

 6     briefs, the certifications and/or declarations and exhibits

 7     thereto.

 8                    So if there's anything -- let me start with the

 9     defense, since it's their application -- that you want to

10     add, I'll be happy to hear you.  But I can assure you I've

11     reviewed everything.  So -- just keep that in mind.

12                    So who's going to take the lead.  Anyone?

13                    MR. EDELL:  I'd like to take the lead, Your Honor.

14                    THE COURT:  Go ahead.

15                    MR. EDELL:  In light of the fact that you've

16     reviewed everything, I just prepared just some demonstrative

17     exhibits.

18                    THE COURT:  In addition to those that are already

19     submitted or --

20                    MR. EDELL:  No, just for today.

21                    THE COURT:  Okay.

22                    MR. EDELL:  That I think might facilitate our

23     discussion.

24                    THE COURT:  Okay.

25                    MR. EDELL:  If I could hand a copy --

1              THE COURT:  Yes, does Mr. Dwyer have a copy of

2      that?

3              MR. EDELL:  I'll give it to him right now.  I think

4      it'll help illustrate the extensive nature and the issues

5      that are involved.

6              THE COURT:  Okay.

7              MR. EDELL:  So the first in these demonstrative

8      exhibits is the calendar for November 2012.

9              THE COURT:  Mm-hmm.

10             MR. EDELL:  This illustrates vacation time that was

11     taken by the plaintiff and approved by Judge Schott.  Judge

12     Schott under the court policies has the responsibility for

13     deciding whether to approve or not approve vacation time.

14     And in November, the plaintiff -- of 2012, the plaintiff came

15     to Judge Schott and said, I'd like to take vacation to go to

16     Virginia to take care of my father.

17             THE COURT:  Right.

18             MR. EDELL:  So we have this time frame to deal

19     with.

20             We also have the application for FMLA leave in

21     December from the 10th to the 26th.  And the remaining time

22     period during November is relevant to see what preparation

23     the plaintiff made in anticipation of going on FMLA leave, if

24     anything.  There are issues of whether she did or did not

25     take the vacation time to go down and take care of her

1   father.  The issues of veracity permeate every aspect of this

2   case and, in fact, is the basic reason why Judge Schott chose

3   to replace the plaintiff as her confidential judicial

4   secretary.

5           December, we have, as I marked in yellow, the dates

6   that the plaintiff was given for her FMLA leave to go

7   Virginia and take care of her father.  It's from December

8   of -- 10th, 2012, through December 26th, 2012.

9           And from Exhibit U that we've submitted to the

10  Court, we know that the plaintiff on December 10,

11  December 11, December 12, December 18, December 20th,

12  December 21st, December -- the 21st, that's the last date,

13  posted on her Facebook, posted posting statements on her

14  Facebook from New Jersey -- from cell towers in New Jersey

15  when she was supposed to be in Virginia.  She executed

16  requests for admissions stating that she was in Virginia when

17  she wasn't.  In addition, we've subpoenaed the Sprint records

18  which indicate that her Sprint phone, the only phone that she

19  says she has, was never used during the time frame

20  December 10 through December 26.

21          THE COURT:  Wait, I'm sorry, tell me that part

22  again.

23          MR. EDELL:  We subpoenaed her Sprint records.

24          THE COURT:  Right.  And so for at least certain

25  parts of that December time frame, you're saying she was in

1    New Jersey.

2          MR. EDELL:  For the entire period of time

3    December 10 through December 26th, those records as reflected

4    in themselves and in the certification of the person who is

5    in charge of those records certify that her phone was only

6    used in the Sprint system in New Jersey and nowhere else.

7    The plaintiff has admitted by failing to respond to requests

8    for admissions that she purportedly had her phone with her in

9    Virginia on the dates in question, meaning that she didn't

10   have anybody else's phone with her when she was in Virginia.

11         So there's an argument in this case that suggests

12   that this is a fishing expedition.  This is not a fishing

13   expedition.  The -- the whereabouts of Ms. Fisher in November

14   and in December are critical, not only in the -- in terms of

15   the phone records, but in terms of all aspects of her social

16   media, various postings, communications, her children were

17   coming home from college.  There's a myriad of people with

18   whom she was communicating with at that time, at a time when

19   she purportedly and says under oath that she was in Virginia

20   taking care of her father under her FMLA leave.

21         THE COURT:  But I did not understand Mr. Dwyer's

22   argument to necessarily be that any inquiry involving social

23   media would be a fishing expedition or beyond the bounds.  It

24   was breadth of the request that he objected to.

25         MR. EDELL:  Well, that's what I'm getting to,

 1    Judge.

 2              THE COURT:  Okay.

 3              MR. EDELL:  I'm getting to the breadth of -- of the

 4    request.

 5              We then have the period the 27th, 28th, 31st, and

 6    the 2d when the plaintiff decided to take sick days and

 7    vacation days instead of coming back to work without

 8    permission from Judge Schott.  And the -- what she was doing,

 9    where she was, and who she got permission from and who she

10    was communicating to, respecting -- with respect to those

11    issues are critical in terms of judging and assessing her

12    veracity and her statements that Judge Schott -- somebody

13    else other than Judge Schott was the one who approved the --

14    the vacation time and the sick time.

15              If we turn to the January 2003 [*sic*] exhibit, this

16    is for her leave from the 10th of January through the 15th of

17    January for a back problem.  This was basically FMLA leave

18    for her own disability.  So we have the veracity of her claim

19    that she had a back problem, who she was dealing with, where

20    she was, what she was doing, and -- to determine whether or

21    not she had a back problem at all.

22              Then she took FMLA leave for disability.  Now, this

23    disability is a disability that she claims arose as a result

24    of --

25              THE COURT:  What period are we on now?

1            MR. EDELL:  If you take a look on the 24th,

2   Your Honor.

3            THE COURT:  January 24th.  Beginning there.  Right?

4            MR. EDELL:  Yeah, beginning there through

5   February --

6            THE COURT:  Looks like -- yeah --

7            MR. EDELL:  -- going through March.

8            THE COURT:  April 2d.

9            MR. EDELL:  Up to April 2d.  Her -- her claim for

10  that disability was the following:  Patient is suffering from

11  severe stress, anxiety, due to familial as -- and

12  work-related issues.  So we have to see what was going on in

13  terms of her family life for that entire period of time, what

14  problems the family was -- family was having, who she was

15  communicating with in the family, whether she was even having

16  those problems at that point in time.

17           Secondly, we have the issue of work-related issues.

18  What was she communicating and to whom, and what was she --

19  what was she discussing on social media with respect to the

20  cause of her problems.

21           Finally, the -- the basis for her FMLA leave for

22  the month of January, February, March, and part of April was

23  that she's unable to concentrate or focus on any assignments.

24           Now, Judge, that in and of itself, the ability to

25  concentrate will be evidenced in her social media.  Is she

1   communicating coherently with other people?  Is she able to

2   focus on issues that are being raised by other people?

3          That's why the scope of this is so broad.  We

4   didn't create these issues.  These are issues that were

5   created by the plaintiff.  She says she can't do any of this.

6   Now, if she can't concentrate and she can't focus, how is she

7   going to be communicating on her social media effectively?

8   So every entry, actually, becomes a question or evidence of

9   whether she was or wasn't focusing and concentrating in

10  addition to the substantive issues.

11         Finally, she says she gets panicky when around

12  people.  Well, let's take a look at her social media and see

13  what her schedule was.  Let's see what the -- the pictures

14  that she -- she has.  Let's see who -- who she was hanging

15  out with.

16         THE COURT:  Wait, I'm con- -- one part, though,

17  that I'm not sure I understand is, obviously, Exhibit U

18  includes quite a bit of what looked to be screen shots from

19  her social media, right, including Facebook?

20         MR. EDELL:  Correct, Judge.  That's just a -- the

21  public Facebook.

22         THE COURT:  Right.  The public Facebook.

23         Why is that not enough to delve into or give you

24  what you think you need in terms of her coherence, her state

25  of mind?  For example, you really want every single private

 1  message she may have had with an immediate relative or a

 2  child?

 3          MR. EDELL:  To understand the nat- -- she's

 4  alleging, Judge, that she would -- I haven't even gotten to

 5  the fact that -- I mean, we're talking about suffering from

 6  severe stress and anxiety in addition to -- excuse me -- her

 7  claim for damages in this case.

 8          So we have to assess the -- the -- the damages.

 9  Are the damages that she claims she's experiencing, both

10  emotionally and physically, accurate or not?

11          THE COURT:  Well, there's all sorts of tools that a

12  party has at their disposal to do that.  For example,

13  obviously, you'll get to depose her.  She'd be -- will

14  submit, of course, I'm sure to an IME.  You may even refer

15  to -- or resort to using a psychologist or a psychiatrist to

16  do a report.

17          Now, I know you're going to tell me, well, yeah,

18  those -- those are tools, but we also have this, which means

19  it's discoverable.  Right?

20          MR. EDELL:  Right.  The only -- the only difference

21  between documents, Your Honor, and what we're talking about

22  in social media is one's electric and one's not.

23          THE COURT:  Right.  But that's a distinction

24  without a difference.  That assumes you're equally entitled

25  to the hard-copy documents.

1           MR. EDELL:  I'm -- I'm entitled to documents that

2    are relevant or reasonably calculated to lead to the

3    discovery of admissible evidence.

4           THE COURT:  Yes.

5           MR. EDELL:  So if -- if she has social media that

6    relates to any of the issues that we just discussed, the fact

7    that she was suffering from severe stress and anxiety due to

8    familial and work-related issues, that she's unable to

9    concentrate or focus on any assignment, think of the -- all

10   the different kinds of communications that relate to that.

11   And that she gets panicky around people.  Well, if she's

12   sitting there so- -- and there's evidence that she's

13   socializing, Judge, that's hard, concrete evidence that

14   contradicts her claim.  It's -- we're not relegated to having

15   an expert examining -- examine her and then have a battle of

16   the experts.

17          THE COURT:  But you're assuming, for example, that

18   there's material in there that will show that she was

19   socializing.  You're working on an assumption.  And if that's

20   an assumption, how is that not a fishing expedition?  You're

21   saying your -- your reasoning goes like this:  Judge, because

22   a lot of people who use Facebook tend to document their

23   various activities and because if she did that and if those

24   activities included socializing with others, then that would

25   be discoverable to show that she has paranoia in dealing with

1   other people.  Putting aside the fact that she may have

2   paranoia dealing with -- assuming any of it's true --

3   assume -- and I am not making an assessment of that at this

4   point, it's not for me to assess.  Assuming that she's either

5   failing or inartfully drawing a distinction, a qualitative

6   distinction, between somebody who does give her paranoia and

7   somebody who doesn't, you're assuming any of that's in there,

8   and we don't even know.

9           MR. EDELL:  Yes, we do, Judge.

10          THE COURT:  So how is that not a fishing

11  expedition?

12          MR. EDELL:  It is not a fishing expedition.  It --

13  we already know that there's solid evidence in her public

14  Facebook that relates to a significant number of issues.

15          THE COURT:  Look, I agree with you with respect to

16  the cell phone data and her whereabouts during the period she

17  was allegedly taking care of her father.  There's no doubt --

18  in fact, I am not even sure whether the plaintiff would

19  argue, Mr. Dwyer, would argue against that being

20  discoverable.

21          The question is not whether that's discoverable.

22  The question is what else is discoverable.

23          So why wouldn't those records be limited, for

24  example, to any postings, messages or -- pertaining to her

25  whereabouts?

 1          MR. EDELL:  Limited to -- to that --

 2          THE COURT:  For the period of --

 3      (Simultaneous conversation)

 4          MR. EDELL:  It should include that, Judge.  But it

 5  should include any posting that relates to any of the issues

 6  that are the subject matter of this litigation, including her

 7  allegations of liability, including her whereabouts,

 8  including her injuries, all of those issues are relevant.

 9  And may --

10          THE COURT:  But they're relevant at different

11  times.  In other words, --

12          MR. EDELL:  Yes, they are relevant to -- at

13  different times.  And there -- that's why the period of time

14  is as extensive as it is.

15          THE COURT:  But those various periods may each be

16  relevant in their own way.  So, for example, right, in

17  December -- from December 10th, 2012, until December 26th,

18  2012, the issue is was she really in Virginia taking care of

19  her father.  Now, you say you have cell phone data records or

20  cell tower location records that show that the phone, at

21  least, was in New Jersey, and she's already admitted by

22  having failed to deny that she always had her cell phone with

23  her.

24          So why wouldn't any inquiry for records on those

25  days be limited to her whereabouts?

1           At that point, she hadn't claimed paranoia in

2    dealing with other people, had she?

3           MR. EDELL:  No.  She didn't -- she is -- well,

4    let's -- let's if we want to go back in time, Judge, her

5    psychiatric problems began in 2008.  We didn't know about

6    until we started doing our discovery.  So those -- those

7    records also relate to whatever family problems she was

8    having at the time.

9           THE COURT:  Which -- wait, which records?  Her

10   psychiatric records?  Which --

11          MR. EDELL:  The -- no, the records -- the social

12   media records for the time period of December -- December

13   through the entire period of time.  Her psychiatric and

14   familial problems and stress predate any of these problems

15   are.

16          THE COURT:  Right, but that's not --

17          MR. EDELL:  So it can predate it and it can be

18   exacerbated thereafter, or it may be revealed that, in fact,

19   she didn't have all of these problems.

20          THE COURT:  Okay.

21          MR. EDELL:  And the -- you know, the cases are

22   pretty clear.  I mean, New Jersey -- there's not one New

23   Jersey case cited by Mr. Dwyer that doesn't -- that suggests

24   that we're not entitled to have these documents --

25          THE COURT:  At the end of the day, isn't -- isn't

1    the point of the case law essentially that social media

2    discovery is to be treated no differently than other forms of

3    documentary discovery?  In other words, how I assess a

4    relevance inquiry under for Facebook is really no different

5    than how I would assess a relevance inquiry for, say,

6    business records or emails.  Right?

7              MR. EDELL:  Exactly.

8              THE COURT:  Okay.  Right.

9              MR. EDELL:  And I'd like to -- you know, the -- I'd

10   like to even point out the -- Mr. Dwyer cites a case --

11   Mr. -- Mr. Dwyer cites a case Giacchetto v. Patchogue-Medford

12   Union Free School District (E.D.N.Y.), and he -- he says was

13   a disability discrimination case.  And he cites for the

14   proposition that you can't just go ahead and -- and have a --

15   have a request for social media.

16             And the court -- and he suggests that the court

17   rejected the plaintiff's entitlement to that.  He says the

18   fact of the -- that the defendant is seeking social media

19   networking information as opposed to traditional discovery

20   materials does not change the judge -- the court's analysis.

21   The fact that an individual may express some joy --

22   et cetera, et cetera.

23             If the court were allowed to -- to allow broad

24   discovery of plaintiff's social networking posting as part of

25   the emotional distress inquiry, then there would be no

1   principal reason to prevent discovery to every personal

2   communication.  Thus, a plaintiff's entire social networking

3   account is not necessarily relevant because he or she is

4   seeking emotional distress.

5            And I agree with that, Judge.

6            But what the case really holds is that it's -- it's

7   virtually impossible for the opposing party to say which of

8   any of these postings, without looking at them, are relevant.

9            I think we've made a prima facie showing that she

10  creates information in her social media that has been

11  relevant to this litigation, both in terms of her -- her

12  state of mind and where she was and what she was doing and

13  the fact that she's lied to -- under oath and she's committed

14  a fraud under the FMLA Act and the like.

15           So what -- what did the court in Giacchetto do?

16  The court in Giacchetto didn't deny the discovery of all of

17  the social media.  What they said -- well, what the court

18  said was that the plaintiff must produce any specific

19  references to the emotional distress she claims she suffered

20  or treatment she received in connection with the incidents

21  underlying her amended complaint; e.g., references to a

22  diagnosable condition or visits to a medical professional.

23  Moreover, in seeking emotional distress damages, plaintiff

24  has opened the door to discovery into other potential

25  sources, causes of that stress.  Thus, any posting on social

1    network websites that refer to an alternative potential

2    stressor must be produced.

3            That's what this court that he says denied the

4    application, plaintiff's -- defendant's application, ruled.

5    These materials are to be served upon defendant's counsel as

6    directed in section (B)(4) below:  Physical damages.

7    Defendants also seek information bearing on plaintiff's claim

8    for physical damages, posting or photographs on social

9    networking websites that reflect physical capabilities

10   inconsistent with plaintiff's claims -- injury, are relevant,

11   and therefore they are to be produced.

12           Same as -- same information that I am discussing

13   with you here.  But there was a question in this case as

14   to -- the -- the underlying facts of where -- where this

15   person was and what this person's doing on occasions that

16   she's -- swore under oath she was somewhere else.

17           Allegations in the amended complaint.  Defendant

18   also seeks any accounts of the events alleged in the

19   plaintiff's amended complaint, contradictory or otherwise.

20   Such information is relevant, and to the extent such

21   information exists on any social networking account

22   maintained by the plaintiff, plaintiff must produce that

23   information.  Plaintiff is therefore required to produce, as

24   directed in section (4)(B) below, any social networking

25   posted -- posting that refer or relate to any of the events

1   alleged in the amended complaint.

2           Events, I would suggest, should also encompass any

3   claims of damage, Your Honor, because they're included in the

4   complaint also.

5           The court finds the following as the approach that

6   should be taken:  Ordering plaintiff's counsel to access

7   plaintiff's social media accounts and produce responsive

8   information as opposed to having plaintiff provide defendant

9   with her user name and passwords.  This court finds that the

10  approach utilized in Howell [phonetic] to be persuasive and

11  reasonable.  Therefore, the accounts -- the court directs

12  that plaintiff's postings be reviewed for relevance by

13  plaintiff's counsel and that plaintiff's counsel, not

14  plaintiff, make a determination regarding the relevance of

15  the posting, keeping in mind the broad scope of discovery

16  contemplated by Rule 26.

17          And then it's -- it cites another case directing

18  plaintiff's counsel to review plaintiff's social networking

19  information for production, holding that counsel for

20  producing party is the judge of relevance in the first

21  instance.

22          The footnote goes on to say:  This approach can

23  lead to results that are both too broad and too narrow.  On

24  the other hand, a plaintiff should not be required to turn

25  over the private section of his or her Facebook which may or

1    may not contain relevant information, merely because the

2    public section undermines the plaintiff's claims.

3              Like here.

4              On the other hand, a plaintiff should be required

5    to review the private section and produce any relevant

6    information regardless of what is reflected in the public

7    section.  The Federal Rules of Civil Procedure do not require

8    a party to prove the existence of relevant material before

9    requesting it.

10             I -- it's not my obligation to prove that it's

11   relevant -- that it's relevant, Your Honor.  My obligation is

12   to show that it's probably relevant or reasonably likely to

13   lead to the discovery of admissible evidence.

14             And I think I've shown that in a prima facie way

15   with the public Facebook.

16             Furthermore, this approach -- let's see, the

17   existence -- furthermore, this approach improperly shields

18   from discovery the information of Facebook users who do not

19   share any information publicly.  For all the foregoing

20   reasons, the court will conduct a traditional relevance

21   analysis.

22             And, Your Honor, there are -- there are myriad

23   cases that talk about the fact that anything that's relevant

24   or reasonably calculated to lead to discovery of admissible

25   evidence in social media that relates to any of the issues,

1    damages, cause of damages, veracity are clearly relevant and

2    discoverable.

3            Now, the Court has -- it has a choice.  Under the

4    broad protective order here, we have in place here, all of

5    this information is protected.  It can be marked

6    confidential.  It can be marked attorney's eyes only.  And we

7    can then have the satisfaction of knowing that we're getting

8    the relevant information, because assessment of relevancy is

9    somewhat subject.

10           I only pointed that -- that out and the fact that

11   that court ruled that this information was relevant and was

12   discoverable and chose a different means by which to make

13   that assessment to -- to show -- to show that Mr. Dwyer

14   quoted that case out of context.

15           THE COURT:  Okay.  All right.  Anything else?

16           MR. EDELL:  Yes, Judge.

17           THE COURT:  Remember, I've read all the briefs and

18   the exhibits.

19           MR. EDELL:  Yeah -- okay.

20           THE COURT:  Because we've already -- you've already

21   been going for over half an hour just on this one point.

22           MR. EDELL:  Okay.  I -- I'm -- I will concede that

23   the relief for sanctions, we'll have to abide the production

24   of the social media and a certification from plaintiff's

25   counsel, if Your Honor's going to let him do it, that all the

1    social media that was created has not been deleted or

2    destroyed in any way.

3              THE COURT:  All right.  Perhaps I'm confused.  So

4    we can agree, can't we, that in order to impose an adverse

5    inference, there has to be actual suppression or withholding

6    of the evidence.  Right?

7              MR. EDELL:  Yes, Your Honor.

8              THE COURT:  Okay.  That's what the court said in

9    MOSAID, and that's what the Third Circuit has held.

10             MR. EDELL:  I agree.

11             THE COURT:  Okay.  There hasn't been a shred of

12   evidence yet of actual destruction of anything.  Right?

13             MR. EDELL:  Yes, Judge --

14             THE COURT:  So the spoliation application is

15   grossly premature, isn't it?

16             MR. EDELL:  It was as an alternative.  I didn't

17   know --

18             THE COURT:  An alternative to what?  There's been

19   no -- demonstrated destruction.

20             MR. EDELL:  We never --

21             THE COURT:  The only thing that's -- that speaks on

22   the subject is the declaration of Ms. Fisher whoself --

23   herself, who says in very clear and uncertain terms -- and I

24   understand you have issues with her credibility, I certainly

25   understand that.  But it says in very clear and uncertain

 1   terms that she hasn't deleted anything since well before she

 2   saw -- she filed this lawsuit.  Right?

 3            MR. EDELL:  That's what she says.  That's why I --

 4        (Simultaneous conversation)

 5            THE COURT:  And I understand.  You've got

 6   credibility issues with her.  I get that.

 7        (Simultaneous conversation)

 8            MR. EDELL:  That's why I said, Judge, I'm -- I'm

 9   not pursuing that in this juncture.

10            THE COURT:  Okay.  Fine.

11            MR. EDELL:  Until I get a certification from

12   plaintiff's counsel, if he's the one who's going to be

13   charged with reviewing this material and making the

14   assessment of whether or not the plaintiff did or did not

15   delete certain information from her social media, or I'd be

16   happy to review it; I'd be more than happy to review it.

17            THE COURT:  I'm sure you would.  Generally,

18   though --

19            MR. EDELL:  To make that determination.

20            THE COURT:  This being similar to any other

21   discovery issue and in any other discovery issue, I can at

22   least tell you, I don't go into discovery issues or discovery

23   production assuming that there's going to be an issue about

24   suppression or withholding.  If that issue unfolds, if it

25   develops, as I've demonstrated in other cases, we are more

1    than prepared to deal with it.

2            But you're raising it as an issue, and I have no

3    way of knowing whether it's ultimately going to be an issue.

4            MR. EDELL:  I agree with you, Judge.

5            THE COURT:  Okay.

6            MR. EDELL:  It was meant to -- to be included as an

7    alternative.

8            THE COURT:  Okay.

9            MR. EDELL:  We didn't get the information.  There

10   was -- obviously we tried to get this information for months

11   and months and months and months and were only thwarted in

12   that effort by Mr. Dwyer.

13           THE COURT:  Well, not because of a spoliation

14   issue, but because the parties have been fighting about the

15   discovery.  It's a relevance issue.

16           MR. EDELL:  We never got a chance to get it before

17   Your Honor.

18           THE COURT:  All right.  That's a separate issue

19   than suggesting spoliation.

20           So what else did you want to argue, Mr. Edell?

21           MR. EDELL:  I want to argue the sanction issue,

22   Your Honor, against Mr. Dwyer.

23           THE COURT:  Okay.

24           MR. EDELL:  We began trying to obtain discovery

25   from Mr. Dwyer as far back as May 6th, 2014.  And Your Honor

1    instituted a format for conducting and resolving discovery

2    disputes.  Your Honor required the parties to prepare joint

3    submissions to the Court identifying outstanding discovery

4    issues and memorializing the parties' respective position,

5    including whatever applicable case law there may be on the

6    subject.  And we were first told to submit that joint

7    submission on May 28th, 2014.  But Mr. Dwyer failed to

8    participate in that process.  And on the 28th, he requested

9    an extension of time to submit his client's position.

10                Thereafter, the plaintiff requested additional

11   extensions, which, again, were granted.

12                On June 9 of 2014, counsel for plaintiff requested

13   the Court to grant yet another extension, which the Court --

14   Your Honor has been very, very generous to Mr. -- Mr. Dwyer.

15   He says he's on -- on trial, and it's a magic word:

16   Automatically, he gets an extension.

17                And Your Honor gave him to the 16th.  However, the

18   16th comes and gone -- comes and goes.  No -- nothing from

19   Mr. -- Mr. Dwyer in that joint submission.

20                On the 16th, he requests again another extension

21   from Your Honor.  And Your Honor gave him until the 30th to

22   participate in this joint submission.

23                The 30th comes and goes, and Mr. Dwyer fails again

24   to participate in the process.

25                On June [*sic*] 1st, we -- we say enough is enough.

1   Let us file a motion, because we're not getting any

2   cooperation from Mr. -- Mr. Dwyer in this respect.

3               Mr. Dwyer didn't respond.  He didn't object.

4               On July 7, we submitted a letter asking, again, to

5   be permitted to file a motion and, again, Mr. Dwyer did not

6   object or respond to that letter.

7               On July 8th, Your Honor ordered that the parties

8   appear on July 10, 2014.  And Mr. Dwyer failed to appear on

9   that date.

10              And, Your Honor, I think that -- I'm glad that we

11  ordered the transcript of that proceeding, because it clearly

12  reveals how misleading Mr. Dwyer was with respect to where he

13  was and what he was doing.

14              The Court asks -- asks Mr. Dwyer:  Now, Mr. Dwyer,

15  the Court had ordered the parties to -- or counsel to appear

16  in court.  Why is it that you are not here, sir?

17              Dwyer:  I apologize, Your Honor --

18              Which is what he does.  He'll get into court and

19  he'll say I'm so sorry, Judge.  I have no excuse.  But on the

20  outside, he's a hard-nosed, give -- you know, give-no-shelter

21  litigator.

22              And he says:  Your Honor, I'm on trial in Mercer

23  County.  And I obviously missed the order on the ECF.  I

24  don't have a better excuse than that.

25              And then he says -- and then Your Honor says:

1   Well, I understand if you're on trial, and I appreciate your

2   candor, Mr. Dwyer.  As I've repeatedly advised, I do not

3   think -- I do not participate in the joint protocol -- if you

4   do not participate in the joint protocol, you run the risk

5   that your right to take any position on the discovery dispute

6   may be waived.  I am not going to do that yet, at least

7   because I understood, Mr. Dwyer, that you're in trial.

8             And I asked for a waiver, Your Honor.

9             And then he says:  All right.

10            Mr. Dwyer:  I am off tomorrow, so I mean, I can do

11   this tomorrow, Judge.

12            And then I butt in, Judge, because I sincerely have

13   had a track record which has been very difficult with

14   Mr. Dwyer.

15            And I said:  Mr. Dwyer plays two roles, one, the

16   hard --

17            THE COURT:  Wait, you know what?  Let's -- let's

18   shortcut this, Mr. Edell.  I have the transcript.  I've read

19   it.  And I was there.  So you don't need to read it.  Just

20   argue your points, and I'm happy to listen.

21            MR. EDELL:  Judge, he doesn't -- Your Honor

22   straight-out asks him:  Are you on trial?

23            And he -- and he actually says -- where is it?

24            This is what he says:  Okay.  The case is Mercer --

25   versus Mercer -- in Mercer County, it's before Judge Massi.

1    The case is Marisa Huerta versus Princeton.  We're not in

2    court today.  We are doing jury selection next week.  We are

3    doing *in limine* motions and going through preliminary

4    evidentiary issues this week.  I was on trial all day Monday,

5    Tuesday, Wednesday, and at the end of the day yesterday, the

6    judge said he wanted me and defense counsel to conference

7    over trial exhibits and then to conference with the court

8    regarding the court's ruling on various *in limine* motions,

9    how that was going to affect the schedule.  And then like I

10   said, I'm off trial because tomorrow's a motion day.

11            And then Your Honor says:  Hold on.  We're not that

12   far yet.  Are you or are you not in court today?  Or did you

13   have a reasonable expectation of being in court today?

14            Mr. Dwyer:  No, I am not in court today.

15            And then he blames -- he uses as an excuse, I

16   didn't get the order on the ECF.

17            Well, he has two associates in his office who are

18   counsel of record in this case -- they've both filed notice

19   of appearances in this case -- who received copies of this,

20   Judge.

21            And it -- I -- it begs credibility that he didn't

22   know about it.

23            Secondly, Your Honor, he -- Your Honor then sets

24   out a -- a scheduling for the filing of the briefs.  And you

25   give me until the 16th by the close of business.  And I file

1   it.

2          You give Mr. Dwyer to the 23d by the close of

3   business.  And he doesn't file it.  No excuse, no request for

4   adjournment.  All he does is file it the next day.

5          Your Honor, he has continually done everything in

6   his power to make discovery impossible.  That's a breach of

7   the RPCs, Your Honor.  All lawyers have an obligation to

8   participate in the discovery process, to expedite it.  He has

9   made it more difficult.  He has at the last moment in every

10  instance made it impossible to submit a joint submission.

11          THE COURT:  And it's a one-way street?

12          MR. EDELL:  Yes, it's a one-way street.

13          THE COURT:  So what about his allegation that the

14  defense had promised to refine the scope of their discovery

15  requests with regard to the social media information and then

16  did an about-face and refused to.

17          MR. EDELL:  That's a lie.  It's a straight-out lie,

18  Judge.

19          THE COURT:  Really?

20          MR. EDELL:  Yes.

21          THE COURT:  That never happened.

22          MR. EDELL:  That never happened.

23          THE COURT:  Okay.

24          MR. EDELL:  He was empathetic that this -- when we

25  discussed this subject, he was empathetic that it was an

1    invasion of privacy.  You're not entitled to anything.

2              THE COURT:  Which isn't necessarily that different

3    than the position that defense took when he issued a similar

4    request.  Right?

5              MR. EDELL:  Well, Judge, he asked for Judge

6    Schott's social media.  How is that possibly relevant?

7              THE COURT:  Okay.

8              MR. EDELL:  I mean, really.  How is that possibly

9    relevant.  She's not a defendant in this case.  She hasn't

10   waived her rights to privacy with respect to any issues.

11             THE COURT:  Okay.

12             MR. EDELL:  Well -- I mean, really.

13             THE COURT:  So let's continue on -- rather than get

14   sidetracked.

15             So your argument essentially is that that never

16   happened, then that -- there was never an agreement by the

17   defense to refine or revisit the social media or the scope of

18   the social media document and interrogatory requests.

19             MR. EDELL:  Absolutely not, Judge.  We -- we

20   said -- I said to him, you know, if you want to come up with

21   some -- some mechanism by which to -- to structure this in a

22   way that you can live with, that's fine.  We will discuss

23   that.  We were willing to discuss it, Judge.

24             But he never got back to me with any such proposal.

25   I wrote him the day after, the day after we met, and I said

1    to him -- I wrote to him --

2            MR. DWYER:  Can I just know the date of --

3            THE COURT:  Yeah, just to orient all of us.

4            MR. DWYER:  We've met multiple times, so I don't

5    know which date he's referring to.

6            THE COURT:  Well, hold on.  Let me -- let me do it

7    for everybody.  So that there's not a bickering between

8    counsel.

9            So I'm -- and I'm looking at plaintiff's brief.  He

10   says you met -- the instance he's referring to is May 9th.

11           MR. EDELL:  That's correct, Judge.

12           THE COURT:  Okay.

13           MR. EDELL:  Saturday, May 10, I send him an email:

14   Andy, thank you for the information regarding your

15   communication with Ayub's [phonetic] office regarding its

16   providing records in response to your -- our request.  I

17   think we made more progress than you felt occurred

18   yesterday -- during yesterday's meeting.  I think that if we

19   both follow up on our respective undertakings, there will be

20   a lot less for Judge Hammer to address, so much so that we

21   might be able to convince him that the remaining issues

22   simply cannot be resolved without court intervention.  That

23   being the case, perhaps if presented properly, we might be

24   able to avoid being held captive on the 21st.

25           THE COURT:  Okay.

1          MR. EDELL:  Okay?

2          And what I said to him, I said, Andy, if you really

3    have such a big problem with this social media, you know what

4    it is, you have access to it.  Tell us.  What do you propose?

5          I don't know what is there, Judge.  How can I

6    reframe it if I don't know what's there?  Just like the judge

7    in the federal district court case that I read from

8    Giacchetto said, you know, the defense attorney doesn't know

9    what's there or what's not there.  He does.  He knows what's

10   relevant and what's not relevant.  And I'll bet you dollars

11   to donuts that there's a lot of relevant information there.

12   And he's been stonewalling us on that.

13         THE COURT:  All right.  We're reverting back to

14   your original arguments.  So -- so --

15       (Simultaneous conversation)

16         MR. EDELL:  And there's -- there's not one

17   document, Judge, between that 21st and today --

18         MALE SPEAKER:  Oh, well --

19         THE COURT:  No, between May 9th.

20         MR. EDELL:  Between May 9th and the filing of his

21   certification with this brief to try to avoid sanctions to --

22   that -- to suggest in any way that we undertook the

23   obligation to reframe these requests.  Not one document.  Not

24   one note from him saying, hey, Marc, where's the -- where's

25   the revisions to the social media request that you promised?

1    That's what -- I mean, come on, Judge.  You would think that

2    there would be something.

3              And he communicated with the Court on June 9

4    talking about meet and confer and what people have done and a

5    joint submission, et cetera, et cetera.  He didn't say I'm

6    waiting for Mr. Edell to provide me with the revised social

7    media request.  Why didn't he do that, then, Judge?  Why

8    didn't he do it on any of occasions when we were trying to

9    put together a joint submission.

10             Why?  It's simple.  It never occurred.  And it's

11   his only excuse.

12             THE COURT:  All right.  What else?

13             MR. EDELL:  We -- well, the only -- it's -- that's

14   about all I have to say, Judge.

15             THE COURT:  All right.  Fair enough.

16             MR. EDELL:  You're great.  You've read all the law.

17   The law is in this District is favorable to us in terms of

18   discoverability of social media.  I think Judge Hochberg's

19   decision, Magistrate Mannion's decision, and Magistrate

20   Waldor's decision --

21             THE COURT:  You're talking about Gatto as well?

22             MR. EDELL:  Yes.

23             THE COURT:  All right.  Okay.

24             MR. EDELL:  Make that clear.

25             THE COURT:  All right.

```
 1              Mr. Dwyer?
 2              MR. DWYER:  Thank you so much, Judge.
 3              And, Judge, I'm going to try my very best to heed
 4   your admonition not to repeat things that are already in our
 5   papers.  I admit I'll probably stray from that a few
 6   occasions to respond to some of the things that Mr. Edell --
 7              THE COURT:  Here's what I want to focus on first,
 8   just to -- just to -- and I want to give you a fair
 9   opportunity.
10              MR. DWYER:  Yeah, I just want to know.  I think
11   that Mr. Edell spoke for about 52 minutes.  I would like an
12   opportunity to respond.
13              THE COURT:  You're going to have it.  Let me --
14         (Simultaneous conversation)
15              MR. DWYER:  I don't intend to use 52 minutes or
16   anything like that.
17              THE COURT:  -- but I'm the one making the decision.
18   So what I need is certain information.
19              MR. DWYER:  Sure.
20              THE COURT:  Okay?  So this is really as much as
21   anything to assist me.  Right?
22              So what I want to focus on first is the substance
23   of the social media --
24              MR. DWYER:  Right.
25              THE COURT:  -- issue --
```

 1          MR. DWYER:  Right.

 2          THE COURT:  -- because I don't think there's any

 3  dispute that the defense is entitled to at least some of it.

 4  It's a question of scope.  Isn't it?

 5          MR. DWYER:  Right.  Well, our position -- one of

 6  the problems with the defendant's argument in their initial

 7  brief, anyway, is that it focused on issues of assertions of

 8  privilege or confidentially or whatnot.  We've never asserted

 9  a privilege in response to these requests.  Our response to

10  these requests were that they were overbroad, they were

11  unduly burdensome, and they were not particularized enough.

12  And the requests that the defendants made in this case are

13  broader than several cases that we cited to Your Honor where

14  the motion to compel was denied because they don't even throw

15  in the phrase at the end "related to this case," or "related

16  to the issues in this case."  They simply say we're entitled

17  to all social media from November 1, 2012, presumably to the

18  present.  There's no end date.  Period.  So there's no

19  limitation on that whatsoever.  And that's the problem.  With

20  the request --

21          THE COURT:  Well, let's start with an even more

22  basic premise.  Do you agree that there's nothing about

23  social media that makes it necessarily special or to be

24  handled differently than other discovery?

25          MR. DWYER:  Absolutely.  And the --

  1                    THE COURT:  Okay.

  2                    MR. DWYER:  -- and like any --

  3                    THE COURT:  So it's essentially a relevance

  4      analysis.  Right?

  5                    MR. DWYER:  Well --

  6                    THE COURT:  It's a Rule 26 analysis.

  7                    MR. DWYER:  It's a -- it's more than just

  8      relevance.  It's that they have to draft their discovery

  9      demands in a way that would put us -- intelligent person on

 10      notice of what they want.  And unless you buy their argument

 11      that they are entitled to everything, every posting, every

 12      private communication, every picture, every group that she

 13      joined, everything, then they haven't done that.  They have

 14      never put us on notice of what the heck they want.

 15                    And I'd really like to respond to something, if I

 16      could --

 17                    THE COURT:  Hold on.  Hold on.  I have one other

 18      question, though.  Your client has clearly put her

 19      psychological state into play.  Right?  I mean she took --

 20      she put it into play in the course of taking leave at certain

 21      times, not all -- not all the time.

 22                    MR. DWYER:  I agree --

 23                    THE COURT:  But at certain --

 24                    MR. DWYER:  -- the short answer is I agree.

 25                    THE COURT:  And seeking -- and claiming that part

1    of her damages was emotional distress.

2                MR. DWYER:  I agree with you.

3                THE COURT:  So if she's done that, doesn't

4    Mr. Edell have at least some argument that various postings,

5    for example, are relevant because if she can write something

6    that's reasonably coherent, does that bear on her ability to

7    focus or concentrate?

8                MR. DWYER:  Well --

9                THE COURT:  And wouldn't that make it relevant?

10               MR. DWYER:  -- and that is why we cited the cases

11   that we cited to Your Honor because those cases reject the

12   idea that you get every posting because the person claims

13   that they suffer from emotional distress damages.  And so we

14   cited to Your Honor the Giacchetto -- or however you

15   pronounce it -- case.

16               THE COURT:  Right.

17               MR. DWYER:  And we did not miscite that case.  We

18   absolutely accurately cited that case.  The court rejected

19   the idea that just because somebody is seeking emotional

20   distress damages, that entitles you to their entire social

21   networking account because she might say something like,

22   isn't it a beautiful day today.  And I'm quoting from the

23   court at 293 F.R.D. 112, the jump cite 115, quote:  Thus a

24   plaintiff's entire social networking account is not

25   necessarily relevant simply because he or she is seeking

1    emotional distress damages.  Unquote.

2           And the [case citation] case, that we previously

3    cited in our brief as well, same issue there, the exact same

4    issue there.  In that case, the defendant asked for any

5    content that would relate to the emotion, feeling or mental

6    state of the plaintiff, on a quote and unquote, because --

7    related to damages, and the court said, no, that's just too

8    ridiculously broad -- overbroad.

9           And the thing is their request isn't even limited

10   to that.  Their request is just everything.

11          So it doesn't matter whether it relates to

12   emotional distress.  It doesn't matter if it relates to her

13   whereabouts.  It doesn't matter what it is.  They just want

14   every -- you know, their Document Request Number 78 wants

15   every photo and every video.  Every single one.  So she posts

16   a cat video, she's got to -- you know, put the cat -- give

17   them the cat video.

18          And there's no case that holds that.

19          And can I please respond to this one thing that

20   Mr. Edell mentioned about the scope issue, because --

21          THE COURT:  Sure, it's on the -- it's on the scope

22   of the social media.

23          MR. DWYER:  Yeah, and it's something that wasn't in

24   my initial brief because he just said it today, okay, so it's

25   a new thing.  Okay?  He denies that this happened.

1              Now, I brought my handwritten notes from my meeting

2    with Mr. Edell and Mr. Nestor in my office, and because they

3    don't contain any attorney-client communication and I don't

4    believe they contain any strategy on my part, I'm happy to

5    give them to you and to Mr. Edell right now.  And I'd like to

6    do that, just as he was able to hand up a little calendar

7    that he made up.

8              THE COURT:  You can, but I mean, you can give it to

9    Mr. Edell.  I'll accept whatever representation you want to

10   make.  I don't know that your notes of what you're about to

11   tell me are any different than what you're telling me under

12   oath.

13             MR. DWYER:  Well --

14             THE COURT:  You're not under oath, but as an

15   officer of the court.

16             MR. DWYER:  That -- to the extent my credibility

17   was -- don't believe anything I say, I want you to be able to

18   see this.

19             THE COURT:  Okay.

20             MR. DWYER:  And so Mr. Nestor and Mr. Edell and

21   myself sat down in my office on May 9th.  We were there for

22   several hours.  We went over a variety of issues.  We started

23   with the phone records issue, because that was one of the

24   more contentious things.

25             And then you see on page 4, we got to the

 1   defendant's deficiency letter.  And I first handwrote was

 2   impasse except where noted; in other words, I was noting the

 3   areas where we might try to find agreement.

 4          And you'll turn to the next page, and DR 79, that's

 5   the document request I cite in my brief.  That's the document

 6   request that we're talking about today.  That's what this

 7   motion is all about.  I know that Mr. Edell wants to talk

 8   about other discovery issues.  But the only thing he's filed

 9   a motion on related to social media.  And so this was the

10   document request that says give us everything from all your

11   social media accounts.  And I wrote what they told me they

12   would do, they said we'll reframe it.  That's why it says

13   "will reframe."

14          I met with these gentlemen again on May 13th and on

15   May 21st.  And I have, by the way, notes for those meetings

16   too.  But at any rate, on those two meetings, nothing came up

17   about the social media issue.  They didn't change their mind.

18   They didn't say, you know what?  Actually, we do want all of

19   your Facebook regardless of what it is, regardless of what it

20   relates to.  They said we will reframe.

21          And so on May 13th, I don't have any reason they're

22   not going to reframe.  On May 22d, I don't have any reason to

23   think they're not going to reframe.  We met three times.

24          And then on May 28th, I get the letter that I annex

25   to my certification from Mr. Edell to me, and when he gets to

1    Document Request 29 -- 79 -- sorry, Document Request

2    Number 79, he completely reneges.  And instead he just

3    recites the document request in its original form, which is

4    all social media.  And he says we're entitled to all of it.

5    So he completely reneges on his position.  He's never once

6    backed off the position, and he doesn't back off on it today

7    now, that he wants everything.

8           And all I said to him, says, look, you've got to

9    give me some idea of what you're looking for and why, which

10   by the way, we did with the phone records.  With the phone

11   records, we marched through it practically day by day as to

12   why he wanted the phone records on a particular day.  You

13   know, well, I think this relates to whether she was in

14   Virginia or not, or I think this relates to his argument

15   before she ever went on the leave.  It relates to whether she

16   properly took vacation time or not, and so forth and so on.

17   We went through that day by day so that I could understand

18   why he claims he wanted stuff -- some of the stuff I agree

19   with him on.  And some of it, I didn't agree with him on.

20          On the Facebook stuff, I said, look, it can't be

21   all the Facebook.  There has so be some reason why you want

22   this stuff.  And I am not the defendant.  And it is not my

23   job to figure out what you want.  It's your job to tell me

24   what you want.  That's what the discovery rules require.  The

25   discovery rule requests have to be framed in a way that --

1   with sufficient particularity to put the other party on

2   notice of what is being asked, so they can intelligently

3   respond.  And just saying we want all the Facebook stuff is

4   not that.

5            So the reason we're here today, reason why this

6   motion was filed is because defense counsel has stubbornly

7   insisted since the time that they filed their -- served me

8   with their document demands, they've stubbornly insisted that

9   they're just entitled to all of the Facebook without

10  limitation whatsoever, without any connection to any issues

11  in the case opinion they don't have to explain why they want

12  it.

13           And that's wrong.  That's clearly wrong under the

14  case law.

15           And that's the second thing, if I may, that I could

16  respond to that is absolutely not in my brief, because they

17  claim that they have all this authority that supports them,

18  and that's just baloney, and I'm going to give you just a

19  couple of examples to just show you that.

20           If you look at page 12 of their brief, they cite a

21  case called EEOC v. Simply Storage Management.  It's a

22  published case, although they didn't have the published cite.

23  But it's been -- now a published case, 270 F.R.D. 430.  They

24  cite that case and they describe, this is the holding.  This

25  is a bare description of the holding.

 1              THE COURT:  I have it.  I have it in front of me.

 2              MR. DWYER:  Requiring the plaintiffs to produce

 3   their entire social media profiles in response to the

 4   defendant's discovery request, unquote.

 5              I have a copy of that decision here.  I'm assuming

 6   Your Honor's already read it or that your law clerk has

 7   already read it --

 8         (Simultaneous conversation)

 9              THE COURT:  Yes, it was -- it's appended as

10   Exhibit Y.

11              MR. DWYER:  Absolutely a false description of what

12   happened in that case.  In that case, the court asked that

13   certain items, certain items from the social media profile be

14   disclosed relating to emotional distress damages and

15   moreover, left it to plaintiff's counsel to determine, in the

16   first instance, what would and would not be produced.  And

17   the Court specifically rejected the argument -- their

18   argument Mr. Edell's making here that they should get

19   everything from plaintiff's social media.  The discovery

20   requests that they rejected as too broad in the Simply

21   Storage Management case are actually narrower than

22   Mr. Edell's requests.  And now I'm quoting from the decision:

23   Although as noted above, the contours of social

24   communications relevant to a claimant's mental and emotional

25   mental health are difficult to define, that does not mean

 1  that everything must be disclosed.  Simply Storage has cited

 2  one decision in which the court did require production of the

 3  plaintiff's entire SNS -- social networking site -- profile,

 4  but that case is distinguishable in a number of ways.

 5         And then after, it explained why they weren't going

 6  to follow that case, the court went on to say:  Moreover, the

 7  simple fact that a plaintiff has had social communications is

 8  not necessarily probative of the particular mental and

 9  emotional health matters at issue in this case.  Rather, it

10  must be the substance of the communication that determines

11  relevance.  To be sure and --

12         THE COURT:  Well, I understand that.  But that's

13  not necessarily different than what Mr. Edell argued.  Isn't

14  it?  In other words, for example, it doesn't -- doesn't

15  relevance here turn to some degree on -- and we keep talking

16  about social media as though it's somehow qualitatively

17  different --

18         MR. DWYER:  I don't say that.  I don't say that.

19         THE COURT:  At the end of the day, it's a relevance

20  issue.  Right?  Sorry, not an -- it's an -- it is a relevance

21  issue.

22         MR. DWYER:  I'm merely pointing out that he cites

23  this authority for the proposition that --

24         THE COURT:  I understand that.

25         MR. DWYER:  -- I can be required to hand over the

1    entire social media site, and the court rejects that.  He

2    deliberately miscites that case to the Court.

3            He -- he claims he has New Jersey authorities.  No,

4    he does not.  He cites the Gatto case, which is a unpublished

5    District of New Jersey case.  In that case, the plaintiff had

6    consented to disclose her social media.  There was no ruling

7    on it.  And then the plaintiff deactivated it and deleted the

8    whole thing.  And that was the issue in that case.

9            THE COURT:  That case is a little bit different.

10       (Simultaneous conversation)

11           THE COURT:  The plaintiff claimed that --

12           MR. DWYER:  That's -- that's not what happened in

13   this case.

14           THE COURT:  The plaintiff claimed that -- they were

15   going through apparently a nasty divorce, and somebody --

16           MR. DWYER:  And they made a mistake, they said.

17           THE COURT:  Yeah.  So --

18           MR. DWYER:  And -- but that's -- what's that got to

19   do with this case?  He cites this case --

20           THE COURT:  Let's focus on -- otherwise, we're

21   going to be here all night.  And we're not -- I can guarantee

22   you both, we're not going to be here all night.

23           MR. DWYER:  I don't want to be here all night.  I

24   want to correct his claim that he's got New Jersey authority.

25   He doesn't have any --

1            THE COURT:  You know what, though?  Part of my

2   frustration in this case is -- is that counsel in this case

3   are more interested in saying -- in pointing out the various

4   issue- -- areas where they think the other side has been

5   disingenuous than in focusing on the substantive issue.

6            The substantive issue here is where do you draw the

7   line.  Right?  Clearly there is at least some social media

8   that needs to be produced.  The question is how much?

9            MR. DWYER:  Can I answer that question?

10            THE COURT:  Yes, and don't -- don't answer it in

11   the way of he's telling you this and he's misleading -- just

12   give me your position.

13            MR. DWYER:  I'm -- I want to answer that.

14            THE COURT:  I don't want mutual recriminations.  I

15   want substance.

16            MR. DWYER:  I am not -- I am not going to

17   recriminate.  I'm going to answer your question, Judge.

18            THE COURT:  Okay.

19            MR. DWYER:  Okay?  The way you do that is you have

20   two people sit down in a room, and you say, well, come on,

21   you can't have the social media, what do you want?  I am not

22   a mind reader.  What do you want exactly?  And tell me why.

23   Which is exactly what we did with the phone records.  And if

24   you want to march day by day, month by month, so, you know,

25   let's just for the sake of discussion that whole description

1    that he gave at the beginning of his oral presentation was in

2    the record.

3              THE COURT:  About the cell site records?

4              MR. DWYER:  About the cell site records and object

5    her having to get Judge Schott permission to go on vacation

6    and all that stuff.  None of that's in this record.  None of

7    it.  The only thing that's in this record are the few

8    Facebook pages that Your Honor noted.  That's it.  Everything

9    else that he said factually, including this calendar, is not

10   in this record.  Not --

11             THE COURT:  Okay.  What you've just -- you realize

12   what you're doing.

13        (Simultaneous conversation)

14             MR. DWYER:  But let's assume it is --

15             THE COURT:  You're inviting him to expand these

16   proceedings exponentially because there's no --

17        (Simultaneous conversation)

18             THE COURT:  Hold on.  Just look at this

19   realistically.  Do you really think Mr. Edell, a

20   well-esteemed officer of this Court, is going to represent

21   that the cell site records show one thing when they actually

22   show something different?

23             MR. DWYER:  I think the cell site records are more

24   ambiguous than he understands.

25             THE COURT:  All right.  That's an issue for another

 1  day.  Go ahead.

 2          MR. DWYER:  I agree.  I agree.

 3          I'm just saying, though, let's assume for the sake

 4  of discussion that that's true.  So then, as Your Honor

 5  pointed out, so, okay --

 6          THE COURT:  And I don't have to decide that in any

 7  event to decide the relevance of the social media.

 8          MR. DWYER:  No.  But it's -- it goes to the

 9  discovery issue, because, for example, if her whereabouts is

10  at issue -- I'm just going to pick up a date range -- if her

11  whereabouts is at issue from December 10th to December 22d,

12  then that would be an argument for getting the Facebook pages

13  for those days to the extent they reveal anything about her

14  whereabouts.

15          THE COURT:  Right.

16          MR. DWYER:  Right?  But if her whereabouts is not

17  at issue -- and, again, I'm going to make up a date range --

18  for the month of February, right, if her whereabouts are just

19  not an issue there, then why do you need the Facebook pages

20  that would disclose something about her whereabouts?

21  Everybody agrees she was on a leave at that time.  Everybody

22  agrees she was on FMLA -- approved FMLA leave at that time.

23          Likewise, take the emotional distress issue.  So,

24  for example, you have a case that he quoted at great length

25  that says if the Facebook posting says something specifically

 1    about the person's emotional distress or it says something

 2    specific about her allegations in this case, or it says

 3    something specific about alternate stressors, alternate

 4    causes of emotional distress, okay, that could be relevant to

 5    emotional distress.

 6              THE COURT:  So if he -- if they were refined to

 7    saying along the lines of produce among other things, any

 8    communications or content reflective of other stressors other

 9    than her work, for example, you're not going to come back and

10    argue that that's vague or unduly broad.

11              MR. DWYER:  I would -- I would write it, you

12    know --

13              THE COURT:  Because that's the condrum [*sic*] that

14    he face -- that the defense faces.  Right?

15              MR. DWYER:  Well, wait, I don't understand the

16    condrum [*sic*].  Why couldn't he just write a more specified

17    request?

18              THE COURT:  Specify -- more specific than what I

19    just heard --

20         (Simultaneous conversation)

21              MR. DWYER:  No, no, more specified than what he

22    gave me.

23              THE COURT:  I guess -- that's -- well, that's --

24    no.  Answer my question.  Don't ask me a question.

25              In other words, if the -- if the interrogatory said

1    for X period, say, I don't know, I'm just -- plucking dates

2    out of thin air --

3         (Simultaneous conversation)

4            MR. DWYER:  Right, like, let's say when she was on

5    disability --

6         (Simultaneous conversation)

7            THE COURT:  January 1 through January 18th, 2013,

8    any and all content pertaining to other stressors in the

9    plaintiff's life or any stressors or sources of anxiety in

10   the plaintiff's life.

11           MR. DWYER:  Yeah, I mean the way that the court in

12   the Giacchetto case put it, was they said:  Thus, any

13   postings on social network sites that refer to an alternative

14   potential stressor.

15           THE COURT:  Right.

16           MR. DWYER:  Okay?

17           THE COURT:  Now, look, with all due respect to my

18   colleague in the Eastern District of PA -- I think that was

19   E.D. Pa.  Right?

20           MR. DWYER:  The Giacchetto case?

21           THE COURT:  Yeah.

22           MR. DWYER:  It was actually the Eastern District of

23   New York.

24           THE COURT:  New York, I'm sorry.

25           MR. DWYER:  It was Kathleen Tomlinson's.

 1            THE COURT:  Yeah.  All I'm wondering is -- is --
 2    does that invite -- look, in that case, if the judge ordered
 3    it, it's one thing.  But does that invite a subsequent fight
 4    over what's within the scope of that discovery request or
 5    what's outside the scope of that discovery request?  Because
 6    even that -- and this may be an area that doesn't lend itself
 7    to much precision.  That's what I'm wrestling with.
 8            MR. DWYER:  Well, let me -- if I may, let me try to
 9    address that specific issue.
10            The court dealt with that question in another case
11    that both of us cite, which is this Mackelprang v. Fidelity
12    National Title Agency.  He cites it on --
13            THE COURT:  That's the District of Nevada case.
14    Right?
15            MR. DWYER:  Yes.
16            THE COURT:  Right.
17            MR. DWYER:  And he cites that case, and we cite it
18    as well.
19            And what the court said in that case was, look --
20    and all the courts say this -- look, the way you do this when
21    there's any kind discovery request -- and, again, social
22    media's not treated differently than anything else.  It's the
23    same as any other type of discovery.  And so what you do in
24    that case is you require the plaintiff's counsel in the first
25    instance to review the documents and figure out what is

1  responsive and what is not.  And then they produce that.

2  Okay?  And then, if there's an issue that comes up later on

3  where somebody says, oh, we have evidence that there was an

4  underproduction here, we have evidence that something was

5  withheld here, then that presents a different issue for the

6  court.

7          But what the court said in Mackelprang is what

8  we're not going to do is (A) we're not going to just give the

9  defendants everything and let them look at it and let them

10 decide what's relevant or who's not, because that's no

11 different than saying, I want to see any papers in the

12 plaintiff's house that might relate to emotional distress, so

13 give me the key to her house so I can go in and rummage

14 around.  It's exactly the same thing.  It's no different than

15 saying, I want to see everything on the hard drive of your

16 computer that might reveal emotional distress.  So give me a

17 complete mirrored copy of your hard drive so I can look

18 through it and see what's there.

19         So that's the first thing you're not going to do.

20         And the second thing you're not going to do, the

21 court says, is you're not going to have an *in camera* on this.

22 *In camera*'s for assertions of privilege.  It's not about

23 issues of relevance.  And that's what this -- as Your Honor's

24 pointed out several times -- that's what this is about.  It's

25 is about relevance.  We've never asserted a privilege on this

```
 1   discovery request.  That's why we've never produced a
 2   privilege log for it, because we don't claim any of this.  We
 3   don't claim something is privileged.  We don't claim --
 4   attorney-client is obviously privileged.  But that's not the
 5   issue here.
 6           THE COURT:  But at the end of the day in -- in
 7   Mackelprang, right, the issue is still one of relevance.  In
 8   other words, the issue is whether the plaintiff's outside
 9   sexual relations, if any, in other words, outside the
10   workplace, had new relevance to the hostile workplace sex
11   discrimination claim.  And the social media -- the scope of
12   permissible social media simply followed that proposition.
13   Right?
14           MR. DWYER:  I'm sorry, Judge, I don't understand
15   what you just asked me.
16           THE COURT:  I thought Mackelprang essentially held
17   that there you had a plaintiff who was bringing hostile
18   workplace sex harassment claims.  Right?
19           MR. DWYER:  Yes.
20           THE COURT:  And the scope of the discovery the
21   defense wanted was essentially any email communications --
22   because she had -- apparently she had two different
23   Myspace --
24           MR. DWYER:  There was --
25           THE COURT:  -- accounts.  Right?
```

1          (Simultaneous conversation)

2               THE COURT:  One where she represented herself as

3    single and not interested in kids.

4               MR. DWYER:  Correct.

5               THE COURT:  The other one where she represented

6    herself as married, loving mother of six kids.

7               MR. DWYER:  Right.

8               THE COURT:  Something like that.

9               MR. DWYER:  Correct.

10              THE COURT:  The defense wanted all email

11   communications concerning sexual relationships both --

12              MR. DWYER:  Right.

13              THE COURT:  -- inside and outside of the workplace.

14              MR. DWYER:  Right.

15              THE COURT:  The court said, wait a minute.  There's

16   a distinction to be drawn, including under Fed. R. Evid. 412.

17              MR. DWYER:  Right.

18              THE COURT:  And under Fed. R. Evid. 412 and under

19   Supreme Court precedent, in-office sexual activity is

20   relevant because it goes to the core of the sexual host- --

21   or the hostile workplace claim.

22              If she's engaging, though, in some affair or

23   something outside of the office --

24              MR. DWYER:  Yeah.

25              THE COURT:  -- not -- outside of employment, not

1    relevant.  And the social -- the scope of the social media

2    that was allowed in that case --

3             MR. DWYER:  Was after she left.

4             THE COURT:  -- followed that.

5             MR. DWYER:  Right.

6             THE COURT:  Right.

7             MR. DWYER:  Right.  But that's not the only thing

8    the court held.  That's not the only thing the court held,

9    because they also raised the issue of damages in that case.

10   It was the same damages argument that Mr. Edell is making.

11            So after they got done with that, the defendants

12   said, well, it also might -- I'm quoting now -- in addition,

13   defendant argues that the private email messages may contain

14   information that plaintiff's alleged severe emotional

15   distress was caused by other factors other than defendant's

16   alleged sexual harassment misconduct, unquote.

17            And the court goes on to say:  Well, that's nice,

18   but that doesn't give you the right to her entire social

19   media profile.  What you can do is you can draft a narrower

20   and more specific discovery request, but not this.

21            And going to the jump cite -- I think it's on

22   page 25 --

23            THE COURT:  25 to 26, actually.

24            MR. DWYER:  Yes.

25            The proper method for obtaining such information,

1    however, is to serve upon plaintiff properly limited requests

2    for production of relevant email communications.  Nothing in

3    this order prevents defendants from serving such discovery

4    requests on plaintiff to produce her Myspace.com private

5    messages that contain information regarding her sexual

6    harassment allegations in this lawsuit or which discuss her

7    alleged emotional distress and the cause thereof.

8            It seems pretty straightforward to me.  And that's

9    exactly the situation we're having here.  And if we had

10   gotten such a request -- and this is not a sexual harassment

11   case, it's not about sexual harassment.  And we -- if we had

12   gotten a request saying, let's see your private Facebook

13   postings or messages that relate to your claims of emotional

14   distress in this case and your claims it was caused by the

15   defendant or going a little bit farther with the Giacchetto

16   case, other stressors that would have been -- that would be a

17   totally different request.  It would be a totally different

18   request.

19           We didn't get that request.  And when I met with

20   them the first time on May 9th, and I said, come on, guys,

21   this is overbroad.  You know it is.  Can you give us a more

22   narrower request.  I don't -- I don't know what you're

23   looking for.

24           Frankly, when we had the discussion about the phone

25   records and why they were supposedly looking for the phone

1    records on particular dates, I was surprised by some of the

2    explanations that Mr. Edell gave me.  That doesn't mean the

3    explanations are bad or evil.  But they weren't explanations

4    that ever crossed my mind in a million years.  And so when he

5    gave me some of those explanations, I was, like, well, I

6    didn't know that's what you were looking for or why you were

7    looking for it.  And some of those explanations, I thought

8    were persuasive and some of them I didn't, and for the ones

9    that I didn't, you know, we're at an impasse on that.

10          But -- but with the Facebook, all I got on May 9th,

11   and I -- not only is it in my notes, but I distinctly

12   remember the whole encounter because Mr. Edell and I were

13   sitting across from each other at the table, and Mr. Nestor

14   was sitting on the end, and when I said, come on, this is

15   overbroad and you know it -- Mr. Nestor was taking notes

16   throughout the whole meeting, Mr. Edell was not, and

17   Mr. Edell looked at Mr. Nestor and Mr. Nestor looked at

18   Mr. Edell and they kind of both shrugged, and Mr. Edell said,

19   okay, you know what?  We'll reframe it.  And I thought,

20   great.  I'll wait till your -- I get your reframed requests,

21   and I'll respond to it when I get it.  No problem.

22          And then I get this letter after two more meetings

23   where nobody changed their mind, I get this letter on

24   May 28th that pretends the whole conversation never happened.

25          THE COURT:  All right --

 1              MR. DWYER:  What am I supposed to do with that?

 2              THE COURT:  Putting aside the mutual

 3    recriminations, let's move forward.  I think -- I think --

 4         (Simultaneous conversation)

 5              MR. DWYER:  Am I able to respond to this --

 6              THE COURT:  -- we've covered the social media side.

 7    Right?

 8              MR. DWYER:  There's a lot more that I would love to

 9    say, but I understand Your Honor's not -- desire not to stay

10    here all night.  So I totally understand that.

11              THE COURT:  Let's keep in mind a couple things.

12    One, this is an issue in which the parties have been going

13    around and around and around.  Two, contrary to the Court's

14    normal practice, I allowed you folks to do a full-on motion

15    with full briefing.  If it hasn't been covered in that -- and

16    I -- as I've said and I meant what I said and I think I've

17    already shown this, I've read everything.  So if there's

18    something else you want to point out, fine, but -- but let's

19    move forward.

20              MR. DWYER:  Well, I do want to point out one other

21    thing here, which is especially related to this issue of

22    emotional distress.

23              Try to remember -- and I don't think this is in the

24    papers, they have gotten without any problem from me, they

25    have gotten access to all her medical records from a variety

1   of different providers.  And they have never deposed any of

2   those providers.  They've never asked the plaintiff a single

3   question.  You know, there's good authority that says when

4   you're talking about some wildly overbroad requests like

5   this, all social media without any limitation whatsoever, why

6   don't you try a couple of other tools first to see what it

7   gets you before you go off to the races with sorting

8   through -- you know, I don't how many hundreds of thousands

9   of pages it's going to be.

10         THE COURT:  I'm sorry, hold that thought.  We'll go

11  off the record for a moment.  I need a two-minute break just

12  to check on something.

13      (Recess:  4:48 P.M. to 5:10 P.M.)

14         THE COURT:  All right.  We are back on the record.

15  I apologize for the interruption.  I had to handle another

16  matter.

17         So, Mr. Dwyer, you were continuing.

18         MR. DWYER:  Thanks.  I just wanted to address --

19         THE COURT:  Go ahead.

20         MR. DWYER:  Oh, it is okay?  I just want --

21         THE COURT:  We're just trying to access my -- a

22  library -- here, but go ahead.

23         MR. DWYER:  Okay.  I just -- that as far as the

24  discovery issue is -- you know, I agree with Your Honor, it's

25  been briefed.

1              I would like to address the sanctions issue, if I

2     may.

3              THE COURT:  Go ahead.

4              MR. DWYER:  Okay.

5              So there's three asserted bases for sanctions here.

6     The first basis is the claim that sanctions should be imposed

7     simply because we objected to this discovery demand.  And,

8     again, the only discovery demand that is before the Court is

9     the discovery demand for social media discovery.

10             Our objection is completely correct.  It's

11    completely well-founded.  We tried to work this out with the

12    defendants.  We thought we were going to get a reframed

13    request.  We never did.  The request, as it stands right now,

14    it doesn't even have the limiting language on it related to

15    this case, much less something that every court that we've

16    cited would require.  Is an improper demand.  It's not an

17    improper demand because it seeks privileged information; it's

18    an improper demand because it's overbroad.  And our objection

19    is correct.

20             But even if it wasn't correct, all we have to do is

21    be substantially justified.  There's no basis for imposing

22    sanctions there.

23             This idea that there should be some kind of

24    sanction imposed for the destruction of evidence --

25             THE COURT:  Well, I think -- I think the defense

1    has -- I don't need you to address that.

2              MR. DWYER:  Well, I want to address one thing

3    because of the third basis for the sanction that relates to

4    that.  The defendants cite in their brief on page 25 and I'm

5    quoting:  It is clear that plaintiff in the instant action

6    intentionally destroyed evidence he knew was relevant to this

7    case, unquote.

8              That's a very serious accusation to level at me or

9    at my client.  And they have no factual basis for it

10   whatsoever.  I don't think that an attorney who is going

11   around making reckless accusations like that -- and they know

12   they have no basis for it, Mr. Edell's admitted -- one of the

13   things he admitted is he had no basis for making that

14   accusation.  I don't think an attorney like that should be

15   asking for sanctions.  That's the kind of conduct that I

16   think is sanctionable, quite frankly, accusing somebody of

17   destroying evidence when they have no basis for believing

18   that it's true.

19             THE COURT:  All right.  But nor have you made

20   either a Rule 11 application or a § 1927 application.  Right?

21             MR. DWYER:  Because you know what -- you know why?

22             THE COURT:  No, no, I am not -- I just -- I want to

23   move this along.

24             MR. DWYER:  Because my focus is on the discovery.

25             THE COURT:  Fine.

 1            MR. DWYER:  Their focus is trying to sanction me.
 2   That's the goal here today.
 3            THE COURT:  What about -- what about the failure to
 4   appear for that conference?  Now, I know you've admitted --
 5   and you've been rather candid that there was a mistake and
 6   that your office for some reason wasn't aware of it.  I don't
 7   think you've seriously contested that you received the ECF
 8   notice --
 9            MR. DWYER:  I did.
10            THE COURT:  -- because it was docketed.
11            MR. DWYER:  I did get the ECF notice.
12            THE COURT:  Okay.
13            MR. DWYER:  In my inbox in my email.  That's
14   absolutely correct.
15            THE COURT:  Doesn't Rule 16(f) provide a more than
16   adequate basis for sanctions here, if only not because of
17   willful misconduct, but because at the end of the day to
18   level the playing field, because the defense showed up to --
19   in compliance with the order and you didn't.
20            And I understand you're going to argument [*sic*] --
21   well, you're going to argue, the conference went ahead
22   anyway, Judge.  But had they known you weren't going to show
23   up and had the Court known you weren't going to show up, I
24   might very well have let them participate by phone.  Right?
25   So -- so are they entitled to some recompense under

1    Rule 16(f)?  And does Rule 16(f) actually compel me to impose

2    sanctions -- just -- I'm focusing now on just the

3    nonappearance, without regard to willful failure to comply.

4           MR. DWYER:  I understand what Your Honor is focused

5    on.  I -- this is why I don't think it would be appropriate.

6    I think it's within your discretion, and this is why I don't

7    think it would be appropriate.

8           I have an explanation for what happened.  I agree

9    that I made a mistake.  But the explanation for what happened

10   is simply that I was starting a brand-new trial, that

11   according to the trial judge presiding over it, was expected

12   to go for six weeks.  It was a massive trial.  I was working

13   day and night on that case.  I was working day and night in

14   the week leading up to it and the weekend before.  And that

15   week leading up to it, quite frankly, was one week in between

16   a trial I had just finished, and in the week leading up to

17   it, I had four depositions and a court appearance.  I mean,

18   this was ridiculous.  I was working ridiculous hours.  I was

19   putting in, you know, 20 hours a day; frankly, on some of the

20   days I was putting all-nighters.  I made a mistake.  And I'm

21   very sorry that I made a mistake.  But that's all it amounts

22   to.

23          And I don't know what Mr. Edell's life experience

24   has been like as an attorney.  I know he's been an attorney

25   longer than I have.  But in the 24 years that I've been an

1   attorney, I've seen attorneys blow things like that.  I've

2   shown up to court for oral arguments, I've shown up to court

3   for status conferences, and I've seen attorneys make those

4   mistakes.  They -- their office miscalendared it or they

5   thought somebody else was covering it or whatever.  They

6   screwed up and they made a mistake.  And every single time

7   I've seen that, including when I was the one involved, in

8   other words, it was my adversary who wasn't showing up plus

9   all the other times when I've been sitting in court for an

10  oral argument on a motion and seen attorneys make that

11  mistake, every single time that has happened, the other side

12  doesn't say, sanction him, sanction him.  The other side

13  says, Judge, I don't know where Mr. Jones is, but I'll go

14  call him on my cell phone and see if I can track him down.

15  And the judge says, okay.  And then they track down

16  Mr. Jones, and then they say, well, Mr. Jones, what happened,

17  and Mr. Jones, says, you know what?  I made a mistake.  I

18  screwed up.  And they say, okay, we're going to plug you in

19  by conference call then, and we'll do the motion that way or

20  we'll do the conference that way.

21          And the person is plugged in by conference call,

22  and the proceeding goes forward.

23          And nobody ever in 24 years -- and I've seen this

24  happen, I'm afraid I've seen it happen dozens of times, I've

25  never seen anybody get sanctioned for this, and I've never

1    seen anybody suggest it, and quite frankly, if it happened on

2    the other direction, I would never suggest it.  I would never

3    say that Mr. Edell should be sanctioned if he made a mistake

4    and didn't show up.

5           So that's what happened.  I didn't do anything

6    maliciously.  I didn't do anything intentionally.  Why would

7    I do that?

8           THE COURT:  No, I understand that.  And I am not

9    saying you did.

10          But does Rule 26(f) require malice or willfulness?

11          MR. DWYER:  I don't think it requires -- I don't

12   think it deprives you of discretion --

13          THE COURT:  Right.  I have discretion --

14          MR. DWYER:  -- to decide whether or not --

15          THE COURT:  -- either way, don't I?

16          MR. DWYER:  Correct.

17          THE COURT:  Okay.

18          MR. DWYER:  And I'm simply saying to Your Honor why

19   I believe the discretion should be exercised not to impose

20   sanctions.

21          I really think that the motivation behind this

22   motion was just to be able to sanction me to gain some kind

23   of psychological edge.  I think that's what this is all

24   about.  Because if this was about the social media stuff, if

25   that's what it was all about, this is something that could

 1  have and should have been worked out three months ago by

 2  Mr. Edell simply drafting a more focused request, which he

 3  had said he was going to do.

 4          THE COURT:  Well -- okay.  What else do you have?

 5  I mean, that -- I -- I can already make Mr. Edell's argument,

 6  which is he's going to go back to the extensive give-and-take

 7  in the May/June/July time frame and your failure to respond

 8  in part -- as partly contributing to a cresting at this

 9  point.

10          MR. DWYER:  But it's not true.  We did discuss it

11  in May.  We went over this issue.  And --

12          THE COURT:  I'm talking about the joint letter

13  requirement.

14          MR. DWYER:  Sure.  But when this particular issue,

15  which is the subject matter of this motion, the social media

16  issue, on this particular issue, the way we left it was he

17  was going to try to come up with a more focused request.  And

18  the --

19          THE COURT:  An assertion he flatly denies.

20          MR. DWYER:  Yeah, I -- I'd like to see Mr. Nestor's

21  note of that meeting in May --

22          THE COURT:  Well --

23          MR. DWYER:  I mean, you know, really we're getting

24  quite along the path of a conspiracy theory, if Mr. Edell is

25  going to say that I took these notes and made them all up and

 1  fabricated it when I said under the discovery request under

 2  7 -- 79, you know, defendants will reframe the request.

 3  That -- that's, you know, really going quite far afield.

 4           Obviously, if Your Honor thinks that that's what I

 5  did, you know, then I can understand why you credit

 6  Mr. Edell's argument that I should be sanctioned, because

 7  here I have gone and made up handwritten notes for the

 8  meeting.

 9           There's no question in my mind -- it's not like I

10  have a recollection problem here.  There's no question in my

11  mind that they said they were going to reframe that request.

12  And quite frankly, it's a little odd for them to say

13  otherwise, because they can't defend their request as

14  written.  The request as written is clearly improperly

15  overbroad.  It has no limitation on it whatsoever.  And

16  there's no case law that they have that supports such an

17  overbroad request.

18           THE COURT:  All right.

19           MR. EDELL:  Your Honor, can I just be heard very

20  briefly?

21           THE COURT:  No.

22           MR. EDELL:  Please?

23      (Conclusion of excerpted proceedings at 5:19 P.M.)

24

25

1                          Certification

2              I, SARA L. KERN, Transcriptionist, do hereby

3    certify that the 68 pages contained herein constitute a full,

4    true, and accurate transcript from the official electronic

5    recording of the proceedings had in the above-entitled

6    matter; that research was performed on the spelling of proper

7    names and utilizing the information provided, but that in

8    many cases the spellings were educated guesses; that the

9    transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11             I further certify that I am in no way related to

12   any of the parties hereto nor am I in any way interested in

13   the outcome hereof.

14

15

16

17

18   s/ *Sara L. Kern*                    5th of August, 2014

19   _____     _____
     Signature of Approved Transcriber              Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services
     901 Route 23 South, Center Suite 3
23   Pompton Plains, NJ 07444
     (973) 237-6080
24

25